## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| **MERRY MAIDS, L.P.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **8:06CV36** |
| **vs.** | ) | |
| | ) | **MEMORANDUM** |
| **WWJD ENTERPRISES, INC., d/b/a** | ) | **AND ORDER** |
| **Merry Maids Franchise #126; MAIDS** | ) | |
| **AND MORE INC.; JAMES M. LOVELY;** | ) | |
| **and STEPHANIE LOVELY,** | ) | |
| | ) | |
| **Defendants.** | ) | |

This matter is before the undersigned magistrate judge by consent of the parties on plaintiff's MOTION FOR PRELIMINARY INJUNCTION [6] in which the plaintiff seeks to enforce the post-termination non-competition provision of a franchise agreement.[1]  An evidentiary hearing began on June 9 and concluded on June 14, 2006.  I find that the motion should be granted.

### FINDINGS OF FACT

For purposes of the Motion for Preliminary Injunction only, I make the following findings of fact.

1.    On June 12, 1998, James Lovely, as President of WWJD Enterprises ("WWJD"), purchased Merry Maids Franchise #126 from Catherine Hogan.  The business

---

[1]At the beginning of the hearing, plaintiff's counsel advised that the request for a preliminary injunction was withdrawn as to infringement of Merry Maids' registered trademarks, as the allegedly infringing behavior has ceased.

was located at 6679 Sorensen Parkway in Omaha, Nebraska.  The purchase agreement

set a purchase price of $95,000 and reflected the following valuation of assets:

> Office equipment and furniture – $5,000
> Office supplies and materials – $1,000
> Cleaning supplies, equipment, and inventory – $4,000
> Customer list – $75,000
> [Hogan's] Covenant not to compete – $20,000

2.     Merry Maids Limited Partnership ("Merry Maids"), in turn, entered into a

Franchise Agreement (Exhibit 13) with WWJD on June 24, 1998, granting WWJD and

James Lovely an exclusive right and license to operate a MERRY MAIDS® franchised

business in a limited territory in and around Omaha, Nebraska.  The Franchise Agreement

provided that it "shall be construed in accordance with the laws of the State of Tennessee."

The Franchise Agreement further provided that "any and all goodwill associated with the

Franchise shall inure exclusively to [Merry Maids'] benefit; and upon the expiration or

termination of this Agreement, no monetary amount shall be assigned as attributable to the

goodwill associated with [WWJD's] use of the Franchise."  Exhibit 13 ¶ 4.B.

3.     The Franchise Agreement set forth the parties' obligations upon termination

or expiration of the Franchise Agreement.  The term of the Franchise Agreement was five

years.  As to termination or non-renewal of the Franchise, the agreement provided:

14.    TERMINATION AND NON-RENEWAL OF THE FRANCHISE; ASSIGNMENT;
MODIFICATION

A.     Merry Maids and the Franchisee each agree to give the other not
less than ninety (90) days written notice of an election not to renew the
Franchise.  In the event Franchisee fails to execute a renewal franchise
agreement, the Franchise Agreement shall expire at the end of its indicated
term without further notice by either party.  In such event, Franchisee shall
have all the rights and duties as set forth in Paragraph F of this Section 14.

-2-

B.    Should the Franchisee wish to terminate this Agreement and not renew for another five (5) year period, it must notify Franchisor in writing ninety (90) days before the expiration of this Agreement.  Exercise of this option by Franchisee shall not cause Franchisor to refuse to renew or extend the term of the Franchise where Franchisee is willing to renegotiate reasonably another Franchise Agreement, except where Franchisee is subject to the terms noted below in Paragraphs C$^2$ or D$^3$ of this Section.  In any case, the Franchisee must notify the Franchisor in writing that this Agreement is expiring within ninety (90) days.

Paragraph 14.F of the Franchise Agreement specified the obligations of the Franchisee upon termination or expiration of the Agreement:

1.    Franchisee is obligated to pay within seven (7) days all Service or other fees and charges owed to Franchisor.

2.    Franchisee shall not hold himself out as a Franchisee and shall cease doing business as Merry maids and cease the use of all trademarks, processes, materials, methods, or promotional materials provided by Franchisor.

3.    Franchisee shall take all necessary steps to disassociate from Franchisor, including the assignment of telephone number(s) and listing(s), the destruction of all letterheads and promotional material, the removal of all identification of the "Merry Maids" name and gtrademarks and the discontinuance of all advertising.

4.    Franchisee shall return to Franchisor all Confidential CD Manuals[,] software programs, video tapes, materials, equipment and training and promotional aids.

5.    Franchisee agrees that for a period of one (1) year following the termination of the franchise for any cause whatsoever, within seventy-five (75) miles from the outermost boundaries of the territory where Franchisee conducts business he or she will not, on his or her own account, or as a

---

[2]Paragraph 14.C gives Merry Maids the right to refuse to renew or extend the agreement if the franchisee has been cited in writing three or more times for failure to comply with the terms of the Franchise Agreement, and under several specific circumstances.

[3]Paragraph 14.D allows the franchisee to terminate the Franchise Agreement at any time upon written notice to Merry Maids at least 120 days before the termination is to take place.

partner, employee, agent, advisor, consultant, or in any other capacity of or for or on account of any person, firm partnership, association or corporation, or as an officer or director or stockholder ..., or otherwise directly or indirectly engage in any business, enterprise or activity competitive with the Franchisor or engage in the marketing or selling of cleaning services, or directly or indirectly engage in any of the following activities:

>a.   solicitation of customers; business patronage or teaching assistance, participation in, or association with any program or matter revealed to Franchisee; or promotion, sale or dealing financially or otherwise in any services, materials or products or substantially similar services, materials or products to those handled, sold, distributed, offered or processed by the Franchisor presently or at any time during the term of this Agreement;

>b.   attempting to hire or entice away any employee or representative of the Franchisor or inducing any employee or representative to terminate his employment with the Franchisor.

* * * *

6.   Franchisee is obligated to notify the telephone company and listing agencies of the termination or expiration of Franchisee's right to use all telephone numbers and all classified and other directory listings of Merry Maids.

7.   If Franchisee retains possession of the Franchised Business premises, he will make such necessary modifications in the exterior and interior decor to eliminate its identification as Merry Maids.

Finally, paragraph 14.G of the Franchise Agreement provided:  "The Franchisee shall relinquish all interest of every kind and description in the Franchise upon termination or expiration of this Agreement, including any goodwill established prior to or during the operation of the Franchise."

4.   James Lovely signed a personal guaranty for WWJD's obligations under the Franchise Agreement.  Stephanie Lovely was not in any way involved in the purchase of Franchise #126.

-4-

5.     James and Stephanie Lovely were both employed by Merry Maids before James purchased Franchise #126.  Stephanie worked for the company-owned Merry Maids business in Omaha for about six months cleaning homes, inspecting homes, doing office work and managing cleaning crews.  She then went to work for James Lovely at Franchise #126.  Before working for Merry Maids, Stephanie had worked eight months cleaning rooms for Super 8 and received housekeeping training from Super 8.

6.     James Lovely had been working for Merry Maids in some capacity since 1988.  He was working at Merry Maids corporate headquarters in Omaha prior to 1995.  When Merry Maids moved its headquarters to Memphis in 1995, James stayed in Omaha to work in the company-owned branch.  When he left in 1998 to purchase Franchise #126, he was manager of the Omaha branch and was Stephanie's supervisor.

7.     James and Stephanie Lovely were married in July 2000.  After the marriage, Stephanie was actively involved in operating Franchise #126 with James, although James performed managerial tasks such as estimates, sales calls, marketing, billing, and payroll.  They both had access to proprietary information about operating a Merry Maids business.

8.     By letter dated October 24, 2003 (Exhibit 1), Donald J. Slifer, Vice President of Market Development for Merry Maids, reminded James Lovely that it was time to renew his Franchise Agreement.  Slifer forwarded the applicable Uniform Franchise Offering Circular ("UFOC"), as required by the Federal Trade Commission, in CD format.[4]  Lovely was asked to sign and return a copy of the disclosure receipt to the Home Office.  Slifer's letter advised that once the disclosure receipt was received, a Franchise Agreement would

---

[4]Slifer testified that the UFOC must be updated semi-annually.

be produced and sent to Lovely for his review and signatures.  James Lovely asked for a hard copy of the document, which was provided to him; however, Lovely did not return a signed receipt.

9.    In January 2004, James Lovely requested additional territory for Franchise #126.  The territory he requested was not open; it was branch office territory, and branch operations would have to decide whether to sell him the territory.

10.    Merry Maids corporate officers received several complaints that James Lovely was doing Merry Maids business outside his assigned territory and inside territory that was assigned to the Omaha branch office.

11.    On January 28, 2004, James and Stephanie Lovely signed a receipt (Exhibit 3) acknowledging that they received a UFOC dated January 10, 2004.

12.    The receipt signed on January 28, 2004 did not result in a renewed Franchise Agreement.   Slifer's January 26, 2004 letter to Jim Lovely (Exhibit 4) reflects that "disclosure version you were previously sent is now out of date" due to FTC notice requirements.  Thus, Slifer forwarded an updated/current Franchise Disclosure Statement and Franchise Agreement and instructed Lovely to sign and date the pink receipt page in the back of the booklet.  Lovely was also advised that "all other owners, officers and directors of the corporation, if any, and their spouses will need to sign the pink receipt and are asked to sign the personal guarantee when the Agreement is executed."  Neither James nor Stephanie Lovely signed or returned this receipt to Slifer.

13.    On December 30, 2004, Slifer wrote to James Lovely explaining that the additional territory Lovely requested "remains an important area for the branch operation," and the committee did not approve selling the area to Lovely.  Slifer's letter (Exhibit 2)

-6-

advised, "With the additional territory request pending we didn't [proceed] on renewal of your Franchise Agreement and we need to get that accomplished."   Slifer forwarded the current Franchise Disclosure Statement with instructions for James and Stephanie Lovely to both sign and date the yellow receipt page and sign a personal guarantee when the agreement was executed.  The December 30, 2004 letter provided that it served "as notice that the current Franchise Agreement for Franchise #126 has been extended through March 31, 2005 to provide time for completion of the new Franchise Agreement."

14.   On May 11, 2005, Slifer wrote to James Lovely advising that, since they were unable to complete the renewal of Franchise #126 before March 31, 2005, Slifer was forwarding an updated/current Franchise Disclosure Statement and Franchise Agreement. The letter (Exhibit 5) states that both James and Stephanie needed to sign and date the pink receipt page in the back of the booklet acknowledging receipt of the information.  The letter further provided: "This letter shall serve as notice that the Franchise Agreements [sic] for Franchise #126 has been extended through June 30, 2005 for the purpose of completing the renewal Agreement."   Neither James nor Stephanie Lovely returned a signed receipt to Slifer.

15.   James Lovely received e-mail messages by way of his father's e-mail address. On June 10, 2005, Merry Maids attempted to notify James Lovely by e-mail that a disclosure booklet was sent to him in May.  The message (Exhibit 6) instructed Lovely to return a signed and dated disclosure receipt so that a franchise agreement could be sent to him.  Lovely denies receiving this message.

16.   Donald Slifer's letter of September 23, 2005 (Exhibit 7) memorializes a conversation he had with James Lovely on September 7, 2005 about their attempts to

complete the renewal of Franchise #126.  The September 23 letter served as notice that the Franchise Agreement "has been extended through October 14, 2005 to allow you another opportunity to submit the necessary document."  Slifer's letter specifically stated that Merry Maids needed to receive the disclosure receipt, signed by both James and Stephanie, by Friday, October 14, 2005,

> or we will have to assume that you are not interested in renewing the Franchise Agreement.
>
> If the receipt is not received [in] the Home Office on or before October 14, the Franchise Agreement will expire on October 17, 2005, and you will be required to stop operating, as explained in Section 14 A.
>
> Jim, if you do want to renew please return the disclosure receipt.

(Exhibit 7).

17.   Neither James nor Stephanie Lovely returned a disclosure receipt as requested in Slifer's September 23, 2005 letter.

18.   James Lovely, by his own admission, did not timely open or read any of the letters or circulars sent to him by Donald Slifer.  "Numb" from the large amount of mail he received from Merry Maids, his practice was to receive the materials, open the envelopes, and put the documents on his desk for possible review at a later time.  He testified he believed Slifer should have contacted him by telephone and told him to open the September 23, 2005 letter.[5]

19.   Due to the defendants' failure to return a disclosure receipt by October 14, 2005, Slifer sent James Lovely an official notice that the agreement for Franchise #126 had

---

[5]Remarkably, James Lovely testified that he did not read any of Slifer's letters until about November 5, 2005, when  he received Exhibit 8, a written notice sent by overnight mail advising that the franchise had actually expired.

expired.  The notice, a letter dated November 4, 2005 (Exhibit 8), advised Lovely that he

was required to comply with all the post-termination obligations outlined in Section 14.G

of the Franchise Agreement, including the following:

- To provide all outstanding service fee reports and pay all amounts due to Merry Maids within seven (7) days of receipt;

- To return all manuals, marketing materials, software, and proprietary customer information software ("CIS") provided by Merry Maids or bearing the names and marks of Merry Maids;

- To cease operating as a Merry Maids franchisee;

- To cease using the trademarks, processes, materials, methods or promotional materials of Merry Maids;

- To notify the telephone company and listing agencies of the termination of his right to use the numbers and listings associated with Merry Maids' names and marks, and to authorize the telephone company and listing agencies to transfer to Merry Maids all such telephone numbers and directory listings; and

- To immediately cause all interior and exterior signs identifying the business premises as a Merry Maids business to be removed, and to remove Merry Maids signs and logos from any vehicles.

The November 4, 2005 letter concluded:

Your attention is specifically drawn to provision 14.G.5.[6] in your franchise agreement relative to competition.  The Agreement provides that you shall not, for a period of one (1) year following the termination of the franchise for any cause whatsoever, within the territory and seventy-five (75) miles from the outermost boundaries thereof, on your own account, or as a partner, employee, agent, advisor, consultant, or in any other capacity of or for or on

---

[6]Apparently, the covenant not to compete upon termination or expiration was renumbered in Merry Maids franchise agreements executed after 2003.  This provision is contained in paragraph 14.F.5 of the Franchise Agreement executed by James Lovely on June 24, 1998.  The provision is included at paragraph 14.G.5 of the form of the Merry Maids franchise agreement attached to its offering circular issued March 8, 2005 (Exhibit 15).  In any event, the November 4, 2005 letter from Merry Maids (Exhibit 8) accurately communicated these obligations to the addressee, James Lovely.

account of any person, firm, partnership, association or corporation, or as an officer or director or stockholder (except a passive stockholder holding less than one percent (1%) of the stock of a publicly held corporation), or otherwise directly or indirectly engage in any business, enterprise or activity competitive with Merry Maids or engage in the marketing or selling of cleaning services, or directly or indirectly engage in any of the following activities:

    1.   solicitation of customers; business patronage or teaching, assistance, participation in, or association with any program or matter revealed to you; or promotion, sale or dealing financially or otherwise in any services, materials or products or substantially similar services, materials or products to those handled, sold, distributed, offered or processed by Merry Maids presently or at any time during the term of the Agreement;

    2.   attempting to hire or entice away any employee or representative of Merry Maids or inducing any employee or representative to terminate his/her employment with Merry Maids.

(Exhibit 8). James Lovely showed this letter to Stephanie. Stephanie Lovely had not read any of the other documents sent to James by Don Slifer.

20. On November 8 or 9, 2005, James Lovely telephoned Don Slifer, upset with Merry Maids' position that his franchise had officially expired. Stephanie Lovely and office manager Laura Hall listened on the speaker phone. Lovely asked Slifer what he could do to reinstate his franchise. Slifer advised that the franchise agreement expired because Lovelys did not sign a renewal agreement, and Lovely could write an appeal letter to Merry Maids, which would be considered by an executive committee.

21. James and Stephanie Lovely sent an appeal letter, dated November 11, 2005 (Exhibit 9), to the five members of the executive committee. The letter, written by James Lovely, expresses their "extreme shock" that the franchise was allowed to expire and explains that Lovely did not notice the September 23, 2005 letter because it was "tucked **inside** the agreement." (Exhibit 9, emphasis in original). The letter explains that James

-10-

Lovely had not returned the earlier receipts because  he "had the dream of writing a letter to propose and convince you of allowing me to purchase and extend my territory[.]"  This letter acknowledges Don Slifer's repeated attempts, during conversations with James Lovely, to obtain signatures from James and Stephanie.  James Lovely also acknowledged that he had not read, or opened, the series of agreements sent to him by Slifer and did not notice Slifer's various letters, which were tucked inside the agreements.  The letter was signed by both James and Stephanie Lovely and reflects that both James and Stephanie participated in operating Merry Maids Franchise #126.

22.   Slifer and the executive committee considered Lovelys' appeal letter.  Noting James Lovely's history of failing to return signed documents and performing services outside the boundaries of his own franchise, the committee deferred to Don Slifer; however, if Slifer decided to consider extending the franchise, there would be specific requirements involved.  Slifer ultimately decided to offer an extension to James and Stephanie Lovely.  Slifer testified that this would be a new one-year franchise with an addendum containing specific conditions.  Several of the conditions would have to be performed immediately, or else the new one-year franchise would not be awarded.

23.   By telephone, Slifer advised James and Stephanie Lovely that the home office would offer them a new one-year franchise on the condition that they immediately (a) provided the home office with a copy of their customer database, (b) provided a list of customers outside their territory boundaries and the reasons they were providing services for non-territorial customers, and (c) explained the structure and relationship of James

Lovely's carpet cleaning business with Merry Maids.[7]  Within the one-year period, James and Stephanie Lovely would be expected to meet certain sales growth requirements, attend company meetings, use new promotional materials, provide internet access in the office, and submit weekly reports electronically.  Slifer testified that the company wanted the customer database as a compliance check due to a series of complaints that Lovely was working outside his assigned territory.  James Lovely told Slifer that he would comply with these requirements.[8]

24.   Sylvia Kimmons is a corporate franchise support manager for Merry Maids, based in Memphis, Tennessee.  On or about November 25, 2005, James Lovely invited her to visit his Merry Maids franchise office because she was scheduled to be in the Omaha area.  She visited the office on December 2, 2005 and was given a tour of the facility.  It was her first visit to that office, where she met James Lovely, Stephanie Lovely, and office manager Laura Hall.   Kimmons took notes during the meeting; the other participants did not.  During the December 2 visit, James Lovely discussed the problems he was having with the home office and the tasks required as a condition for his receiving the one-year franchise.  He expected Kimmons to know the details of his business relationship with the home office and became frustrated and even angry upon finding out

---

[7]James Lovely owned and operated a separate carpet cleaning business called Lovely's Steam & Clean.  (*See* Exhibit 14).  He previously told the home office that the carpet cleaning business belonged to his brother.   Lovely's Steam & Clean, at one point, offered "Complete cleaning service," including carpet, cabinets, tile, windows, linoleum and "general cleaning (vacuum, dusting, etc.)."

[8]Although James Lovely testified, essentially, that Slifer verbally offered him a one-year extension unconditionally, I do not find Lovely's testimony on that point to be credible.  In contrast, Slifer's version of the matter is highly credible because it reflects a business decision that would be made by any reasonable person under these circumstances.

that she did not.  James Lovely told Kimmons he had no intention of performing those tasks and said he did not sign the agreements forwarded to him by Slifer because Merry Maids would not give him more territory.  Kimmons testified, quite credibly, that James Lovely threatened to sue Merry Maids if his franchise was terminated.  He also threatened to take $10,000 out of his savings and sue Merry Maids before he opened up "Jim and Stephanie's Maids" across the street.

26.    Based on her notes of the December 2 meeting, Kimmons completed a written report of this office visit (Exhibit 24) and also discussed the incident with Don Slifer.  Slifer and the leadership team were "furious" at James Lovely's treatment of Sylvia Kimmons.

26.    On December 7, 2005, James Lovely contacted Nichole Porter, the manager of Merry Maids' corporate branch in Omaha, and asked if he and Stephanie could come and visit her office.  Porter had contacts with Lovely over a five-year period, including inquiries about his doing work for customers who were located in Porter's business territory. Based on advice from corporate headquarters, Porter ultimately told Lovely such a visit would be inappropriate.  Lovely told Porter that he wanted help with marketing and wanted to know if she had extra work for him.  According to Porter, Lovely expressed anger at having to wait a year to find out that he would not be given an expanded territory.  Lovely said he believed the home office was trying to "screw him out of his franchise" and did not react favorably to Porter's response that she did not have any extra business to refer to him, and he would have to discuss those issues with the home office.  Porter prepared a memorandum of the conversation (Exhibit 25) to forward to the home office.

27.    The documents necessary to effect the one-year franchise were being drafted at corporate headquarters prior to the Lovelys' contacts with Sylvia Kimmons and Nichole

-13-

Porter.   After receiving information about these incidents, the executive committee concluded that James Lovely had done nothing, and intended to do nothing, to accomplish the tasks he was told were necessary to obtain the one-year franchise.

28.   James Lovely called Don Slifer on approximately December 10, 2005 and asked where the one-year contract was.  According to Lovely, Slifer told him "don't bother" to send the information that was previously requested.

29.   By letter dated December 15, 2005 (Exhibit 10), James Lovely was informed:

> The Executive Committee has decided to deny your request for reconsideration and to allow the expiration of your franchise agreement to stand.  Therefore, you must cease operating a residential cleaning business under the Merry Maids names and marks and comply with all post-expiration obligations of your former Franchise Agreement, including the post-expiration covenant-not-to-compete....

30.   WWJD and James Lovely, with the assistance of Stephanie Lovely, openly operated as a Merry Maids franchise until the end of December 2005.

31.   In December 2005, James Lovely gave Stephanie Lovely $10,000 to finance a new business, defendant Maids & More, Inc.  The money was drawn from an account accessible only to James Lovely.  He also transferred all the physical assets of the Merry Maids franchise that were not marked as Merry Maids products (building lease, vehicles, equipment, supplies, and the like) to Stephanie Lovely.   These transfers were not documented, and neither Stephanie Lovely nor Maids & More were required to reimburse James Lovely for the $10,000 deposit or the other business property.  The Merry Maids customer list and customers' keys were retained by James and Stephanie Lovely.  The Merry Maids uniforms, supplies and materials were given to a Merry Maids franchisee in

-14-

Sioux City, Iowa.  The Merry Maids signage was covered on or about December 19, 2005 and was removed from the premises at 6679 Sorensen Parkway on January 10, 2006.

32.    The Articles of Incorporation for Maids & More, Inc. (Exhibit 20) were filed with the Nebraska Secretary of State on December 20, 2005.   On December 23, 2005, Stephanie Lovely applied for an Employer Identification Number as President of Maids & More.  During December 2005, Stephanie Lovely set up a new phone line with Qwest and purchased yellow pages advertising from Dex Media and Yellow Book USA.  She obtained liability insurance and purchased supplies for Maids & More.  She began accepting new applications from the existing Merry Maids employees in December 2005 and hired the former employees of Merry Maids Franchise #126 as employees of Maids & More.

33.    During the week of December 26, 2005, Stephanie Lovely and Laura Hall contacted their Merry Maids customers to announce the existence of Maids & More.  They clearly indicated that, effective immediately, they would no longer be operating as  a Merry Maids franchise.  They offered the services of Maids & More to the existing Merry Maids customers.

34.    In addition to giving her $10,000 start-up money and the physical assets of the former Merry Maids franchise, James Lovely assisted Stephanie Lovely by attempting to teach her bookkeeping and payroll tasks using the Merry Maids proprietary software. Stephanie ultimately hired a separate accountant.  Laura Hall continued her position as office manager without interruption.  James Lovely has had no involvement with Maids & More since January 15, 2006.  This lawsuit was filed on January 27, 2006.

**LEGAL ANALYSIS**

In this case, Merry Maids alleges that the defendants, acting in concert, have been operating the Maids & More business in violation of the noncompete clause in Paragraph 14.F.5 of the Franchise Agreement, quoted above, and that the noncompete clause is enforceable under applicable state law, i.e., the law of Tennessee.

Defendants James Lovely and WWJD contend that Franchise #126 was improperly terminated by Merry Maids, the covenant not to compete expired in 2003 and is unenforceable, James Lovely had no involvement in setting up Maids & More, and James Lovely is not involved in any way in the operation of Maids & More.

Defendants Stephanie Lovely and Maids & More contend that they are not bound by the noncompete clause because Stephanie Lovely did not sign the Merry Maids Franchise Agreement and did not perform a managerial role in the Merry Maids business. Stephanie Lovely further argues that she, her family, and her employees would be unduly harmed by the issuance of a preliminary injunction.

**A.    Duration of the Franchise Agreement**

The record shows that the original Franchise Agreement was to expire on June 23, 2003.   Don Slifer's December 30, 2004 letter extended the term of the Franchise Agreement through March 31, 2005 to allow Lovely to complete a new franchise agreement.   Don Slifer's May 11, 2005 letter further extended the term of the Franchise Agreement through June 30, 2005 for the purpose of completing a renewal agreement. Slifer's September 23, 2005 letter served as notice that the Franchise Agreement was extended through October 14, 2005 to allow James and Stephanie Lovely a final

-16-

opportunity to submit the necessary renewal document.  Slifer's letter specifically warned, "If the receipt is not received [in] the Home Office on or before October 14, the Franchise Agreement will expire on October 17, 2005."  The defendants acquiesced to Merry Maids' written extensions of the Franchise Agreement by accepting the benefit of the extensions and continuing to operate their Merry Maids business, uninterrupted, throughout this entire time period.

The court finds that the original Franchise Agreement for Franchise #126 expired on October 17, 2005 because the defendants did not execute the documents necessary to renew their franchise.

James and Stephanie Lovely continued operating the Merry Maids business after October 17, 2005, pending a decision on their appeal.  Their appeal letter reflects the active participation and interest of Stephanie Lovely in operating the Merry Maids business.

Turning to the attempted one-year continuation, the court finds that this proposed contract was separate and distinct from the original Franchise Agreement.  James Lovely's self-serving testimony that Slifer offered him an unconditional one-year extension of Franchise #126 is not credible.  Slifer's testimony that he told Lovelys that the home office would offer them a new one-year franchise if they met certain conditions is consistent with a rational business decision that could be made under these circumstances and the court finds Slifer's testimony to be credible.  The court further finds the testimony of Sylvia Kimmons to be credible, based on her demeanor and her testimony that she took notes of her December 2, 2005 contact with the defendants.  The court accepts as true Kimmons' testimony that James Lovely told her he did not intend to perform the conditions necessary for Lovelys to obtain a one-year franchise from Merry Maids.

-17-

In summary, the Franchise Agreement for Franchise #126 was not terminated by Merry Maids. It expired on October 17, 2005. After that date, James and Stephanie Lovely continued to operate Merry Maids Franchise #126 while their appeal or request for reconsideration was pending. James Lovely then announced to Sylvia Kimmons that he did not intend to perform any of the conditions necessary for Lovelys to obtain a one-year franchise from Merry Maids. Thus, the court finds that the Merry Maids Executive Committee and/or Don Slifer did not breach any oral agreement in denying the defendants' appeal and allowing the expiration of the Franchise Agreement to stand. As of December 15, 2005, the defendants had no right to do business as Merry Maids, and the provisions of the covenant not to compete set out in Paragraph 14.F.5 of the original Franchise Agreement became effective.

Turning to the argument that the noncompete agreement is otherwise unenforceable, Tennessee law provides that a covenant not to compete, or noncompete agreement, is enforceable "where the restrictions contained in the covenant are found to be reasonable." *Dabora, Inc. v. Kline*, 884 S.W.2d 475, 477 (Tenn. Ct. App. 1994). Factors the court must consider when determining reasonableness include the consideration supporting the agreement, the threatened danger to franchisor in the absence of such an agreement; the economic hardship imposed on the franchisee by such a covenant, and whether the covenant would be contrary to public interest. *See id.* In *Merry Maids Limited Partnership v. Kamara*, 33 F. Supp. 2d 443 (D. Md. 1998), the court held that the one year, 75-mile noncompete provision that is now at issue in this case would likely be found reasonable by the courts of Tennessee. I concur with that assessment because the Franchise Agreement for Franchise #126 was executed in an

-18-

arm's length transaction and was supported by consideration, and Merry Maids has demonstrated a substantial interest in protecting its business interests and maintaining the integrity of its franchises. There is no evidence or argument that competition for cleaning services within the 75-mile boundary would be adversely affected if the noncompete agreement is enforced.

### B.   Whether a Preliminary Injunction Should Be Issued

Whether a preliminary injunction should issue involves consideration of "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public Interest." *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc); *Accord Mid-America Real Estate Co. v. Iowa Realty Co., Inc.*, 406 F.3d 969, 972 (8th Cir. 2005).

The movant, Merry Maids, bears the burden of establishing that a preliminary injunction should be issued. *See Baker Elec. Co-op, Inc. v. Chaske*, 28 F.3d 1466, 1472 (8th Cir. 1994). No single *Dataphase* factor is, in itself, dispositive. All of the factors must be considered to determine whether, on balance, they weigh towards granting the injunction. *See id.* at 1472. The issuance of a preliminary injunction will be reversed only if the issuance "is the product of an abuse of discretion or misplaced reliance on an erroneous legal premise." *City of Timber Lake v. Cheyenne River Sioux Tribe*, 10 F.3d 554, 556 (8th Cir. 1993), *cert. denied*, 512 U.S. 1236 (1994).

### 1.   Threat of Irreparable Harm

The court finds that Merry Maids will suffer substantial irreparable injury if a preliminary injunction is not granted. As Judge Kopf explained in a very similar case,

-19-

*Servicemaster Residential/Commercial Serv., L.P. v. Proctor*, No. 4:01CV3089 (D. Neb. Oct. 31, 2001) (granting request for preliminary injunction), "[t]he net result of failure to enforce the non-competition provision would be a heavy blow to the franchise system developed by the plaintiff." The covenant not to compete was intended to maintain the franchisor's control of reputation and good will.[9] Merry Maids' ability to re-franchise the area will be compromised if a former franchisee is allowed to operate in the area under a different name. An injury to these interests cannot be accurately or easily measured by an award of damages. I agree with Judge Kopf that, unless the defendants are stopped from violating the non-competition provisions of the Franchise Agreement, Merry Maids faces the likelihood that its other franchisees will "flaunt" the agreement.

### 2. Balancing the Burdens Between Plaintiff and Defendants

Stephanie Lovely has testified that she, her husband, their children, and her employees will suffer serious disruption and financial harm if she is not allowed to continue doing business as Maids & More. While this burden may be significant, it is less significant than the burden Merry Maids would suffer if the court does not grant the motion for preliminary injunction. The defendants will be free to do cleaning work outside the 75-mile boundary and to perform services that Merry Maids does not provide.

---

[9]James Lovely's own testimony reflects the significant value of operating this business as a Merry Maids franchise. He estimated the value of the business, as a Merry Maids franchise, to be between $250,000 and $300,000. Operating as Maids & More, the business is worth about $25,000.

### 3.    Probability of Success on the Merits

The court finds that Merry Maids is likely to prevail on the merits in this instance. As discussed above, the one year 75-mile noncompete provision at issue in this case would likely be found reasonable and enforceable by the courts of Tennessee.

### 4.    Public Interest

The public interest will be served by granting a preliminary injunction in this instance. The enforcement of a reasonable covenant not to compete serves to confirm the legitimate expectations of business people who enter into franchise agreements.  "It is important to the rational conduct of commerce that expectations expressed in written agreements be enforced unless there is a very good reason not to do so." *Servicemaster v. Proctor*, No. 4:01CV3089 Slip op. at p.21 (D. Neb. Oct. 31, 2001).  Here, there is no good reason why this agreement should not be enforced.

### C.    Terms of the Preliminary Injunction

The court has considered the argument of James Lovely that neither he nor WWJD is involved in operating Maids & More, together with the argument advanced by Stephanie Lovely that she cannot be enjoined from operating Maids & More because she did not sign any Franchise Agreement with Merry Maids.  These arguments are disingenuous.

Rule 65(d) of the Federal Rules of Civil Procedure provides:

Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained; and is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon *those persons in active concert or participation* with them who receive actual notice of the order by personal service or otherwise.

-21-

Rule 65(d) was intended to prevent defendants from nullifying a decree "by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding." *Independent Fed'n of Flight Attendants v. Cooper*, 134 F.3d 917, 919 (8th Cir. 1998) (quoting *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 1 (1945)); *see also Chicago Truck Drivers v. Brotherhood Labor Leasing*, 207 F.3d 500, 507 (8th Cir. 2000).

The formation of Maids & More did not involve any arms-length transaction between James and Stephanie Lovely.  The evidence was uncontroverted that James Lovely gave Stephanie Lovely the sum of $10,000 from an account she could not access for the purpose of starting Maids & More.  There was no expectation that Stephanie or Maids & More would reimburse James for his $10,000 advance.  James Lovely and/or WWJD also transferred the physical assets of the Merry Maids franchise to Stephanie Lovely for no consideration.  The transfers of property and money between James and Stephanie Lovely were undocumented.  James Lovely also gave confidential and proprietary information to Stephanie Lovely, i.e., the Merry Maids customer list and proprietary software.  Using this information, Stephanie Lovely was able to contact and solicit business from Merry Maids customers.  The cleaning business operating out of 6679 Sorensen Parkway continued, uninterrupted, during its transition from a Merry Maids franchise to Maids & More, which now supplies services formerly supplied to its customers by Merry Maids.  Finally, the business property has remained within the Lovely family, presumably to the benefit of all the defendants.  The evidence, considered as a whole, and based on the credibility of the various witnesses, strongly suggests that James Lovely intended to and has "parked" his cleaning business with his wife, so he can return and run it himself after the one-year contractual period expires.

I find that James and Stephanie Lovely acted in active concert or participation in establishing Maids & More and that a preliminary injunction should be entered against all the defendants.

Turning to the duration of the injunction, the court believes the one-year covenant not to compete would have begun on or about December 16, 2005, upon the defendants' receiving notice that their request for reconsideration was denied and the expiration of the franchise agreement would be allowed to stand.  The defendants, however, did not honor the agreement and immediately began doing business as Maids & More.  Since the Merry Maids Franchise Agreement contemplated a full year of non-competition, I conclude (as did Judge Kopf in *Servicemaster v. Proctor*, No. 4:01CV3089, Slip op. (D. Neb. Jan. 3, 2002), that the preliminary injunction entered in this case should afford that relief.

## PRELIMINARY INJUNCTION

**IT IS ORDERED** that plaintiff's MOTION FOR PRELIMINARY INJUNCTION [6] is granted, as follows:

1.    All defendants, i.e., WWJD Enterprises, Inc., Maids and More, Inc., James M. Lovely, and Stephanie Lovely, are hereby and immediately restrained from violating the provisions of the non-compete agreement set out in paragraph 14.F.5 of the Franchise Agreement executed by James Lovely on June 24, 1998.

2.    The officers, agents, employees and those in active concert or participation with the defendants, shall not aid or abet the defendants, WWJD Enterprises, Inc., Maids and More, Inc., James M. Lovely, and Stephanie Lovely, in violating the provisions of the

non-compete agreement.  This provision specifically applies to the employees of Maids & More.

3.    As of the date of this Preliminary Injunction, the defendants, WWJD Enterprises, Inc., Maids and More, Inc., James M. Lovely, and Stephanie Lovely, shall not own, maintain, engage in, or have any interest in any type of services offered by the plaintiff, Merry Maids, L.P.

4.    This injunction is limited to the area falling within seventy-five (75) miles from the outermost boundaries of the territory described in Exhibit A of the Franchise Agreement executed on June 24, 1998 by James Lovely.

5.    This injunction shall expire on June 21, 2007 without further order of the court unless it is terminated earlier.

6.    On or before June 30, 2006, the plaintiff shall give security, within the meaning of Fed. R. Civ. P. 65(c) in the sum of $500.00.

**DATED June 20, 2006.**

**BY THE COURT:**

**s/ F.A. Gossett**
**United States Magistrate Judge**

-24-